**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES P. BLOUNT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15-CV-322 DDN |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM**

This matter comes before the Court on defendants Albert Napier, Zachary Nicolay, and Matthew Miller's Motion for Summary Judgment, and defendants Brent Fincher, Ryan Strittmatter, John Vogt, Terrence Howard, and Scott Aubuchon's Motion for Summary Judgment. (Docs. 211, 213.)  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I.      BACKGROUND**

**A.      Procedural Background**

In 2015, plaintiff James Blount filed this suit against various defendants in the Circuit Court of the City of St. Louis asserting claims under 42 U.S.C. § 1983 and various state law violations after an incident on January 20, 2013, at Lumiere Place Casino and Hotels in St. Louis, Missouri. Plaintiff's original petition included claims against the City of St. Louis, the St. Louis Board of Police Commissioners, the St. Louis Metropolitan Police Department ("SLMPD"), Hudson Services, Lumiere Casino, and several individual officers of the SLMPD. After various dismissals by plaintiff voluntarily and by the Court, and amended complaints, the following defendants and claims asserted in plaintiff's Second Amended Complaint remain:

1

(1) Deliberate indifference to and deprivation of plaintiff's medical needs in violation of plaintiff's Constitutional rights against defendants Aubuchon, Fincher, Howard, Miller, Napier, Nicolay, Strittmatter, and Vogt in their individual capacities;

(2) Excessive use of force in violation of the Fourth Amendment of the U.S. Constitution and the Due Process Clause of the Fourteenth Amendment against defendant Miller in his individual capacity;

(3) Failure to intercede in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution against defendants Aubuchon, Fincher, Howard, Miller, Napier, Nicolay, Strittmatter, and Vogt in their individual and official capacities;

(4) False imprisonment in violation of Missouri law against defendants Howard, Miller, Napier, and Nicolay in their individual capacities;

(5) False imprisonment and injurious falsehood in violation of Missouri law against defendants Howard, Miller, Napier, and Nicolay in their individual capacities;

(6) Violation of plaintiff's First Amendment rights to access the courts and/or petition the government against defendants Aubuchon, Fincher, Howard, Miller, Napier, Nicolay, Strittmatter, and Vogt; and

(7) Fraud and conspiracy to commit a civil tort of fraud, false imprisonment, and injurious falsehood against defendants Howard, Miller, Napier, and Nicolay in their individual capacities.

(Doc. 144.)

## B.    Undisputed Facts

On January 20, 2013, plaintiff and a third party, Steven C., were involved in an altercation outside of Lumiere Casino. The security video shows a man hit plaintiff and plaintiff immediately struck back. Plaintiff had ingested alcoholic beverages at the casino.  Off-duty police officers Keith Major, Nicholas Shelton, Erich VonNida, and Ezell Cody, Jr. were working secondary employment for Hudson Security at the Casino. Officer Major reported plaintiff punched Steven C. in the face with his fist so the officers moved to detain plaintiff and arrest him for assault. The off-duty officers then used force against plaintiff. Officer VonNida ordered Lumiere security to respond with an EMT and advised them to contact St. Louis City EMS for plaintiff's injuries. After video surveillance revealed Steven C. had struck plaintiff first, the officers also placed Steven C.

2

in handcuffs and advised him he was under arrest for third-degree assault.  After the use of force by the officers, plaintiff complained of right hip, head, neck, and back pain.[1]

### i.      Sergeant Albert Napier

In 2013, Albert Napier was a sergeant working in the Fourth District supervising uniform personnel.  His shift was from 11:00 p.m. to 7:00 a.m. On January 20, he turned his watch over to Sergeant Lucinda Miller.  Sergeant Napier was dispatched to the Casino because the off-duty officers at the Casino had an arrest.  By the time Sergeant Napier arrived, the use of force by the off-duty officers had ended. Sergeant Napier was the scene supervisor for the incident. The four off-duty officers were not under Sergeant Napier's command in the Fourth District because they were not Fourth District officers.  At the scene, the primary investigating officer was Officer Major. Sergeant Napier had no discussion with plaintiff at the scene, or later, but he did review a security video of the use of force incident when he arrived.

EMS arrived on the scene at the same time as Sergeant Napier.  Once they arrived, plaintiff's medical treatment shifted to EMS. The EMS report notes that it took an extended amount of time for the ambulance to leave the scene because they were waiting for a police escort. When an ambulance is on scene for more than 15 minutes, a reason is given in the report. Someone on scene told the EMT that plaintiff was told to leave the Casino and he started resisting. No one informed the EMT that plaintiff had been the victim of an assault.

Sergeant Napier considered plaintiff a prisoner from the moment he was placed under arrest. Officers Nicolay and Miller, both under Sergeant Napier's command in the Fourth District,

---

[1] The off-duty officers were originally named in this case but have been dismissed. Therefore, the Court makes no judgment as to whether or not defendants' use of force against plaintiff was excessive as it is not necessary to decide the issues in defendants' motions for summary judgment.

reported to the scene.  Sergeant Napier told Officer Miller to ride in the ambulance with plaintiff and for Officer Nicolay to follow in a marked police car. Sergeant Napier did not go to the hospital.

### ii.     Zachary Nicolay

Officer Nicolay has been assigned to the Fourth District for over ten years. On January 20, Officer Nicolay had been an officer for approximately six years, receiving his training in the police academy. When Officer Nicolay arrived at the Casino, the use of force by the off-duty officers had ended and plaintiff was either on a stretcher being put into the ambulance or already in the ambulance. While Officer Miller rode in the ambulance, Officer Nicolay drove a marked police car behind the ambulance. On the way to the hospital, the ambulance pulled over. Officer Nicolay pulled up behind and walked up to the ambulance and was told they were good, so he went back to his car and continued following. Officer Nicolay does not remember Officer Miller telling him at any time that plaintiff was combative with him while in the ambulance.

Once at the hospital, plaintiff was taken into the emergency room and treated by doctors. Officer Nicolay parked in the police parking next to the ambulance bay and walked up to the ambulance. Officers Nicolay and Miller were together at the hospital until relieved at 7:00 a.m., the end of their shift. Officer Nicolay did not do any type of police assistance with plaintiff at the hospital. He did not have to restrain plaintiff nor did he see Officer Miller take any action to restrain plaintiff. After Officers Nicolay and Miller were relieved, they had no other involvement with plaintiff. They did not convey him to the Justice Center.

### iii.    Matthew Miller

Officer Miller is a police officer assigned to the Fourth District. He was trained at the police academy. Officer Miller did not write the incident report because writing the report was not

4

assigned to him, and he did not review the report until this litigation. He also did not take any notes in this particular case. Officer Miller did not speak with the author of the report, Officer Major.

Sergeant Napier assigned Officer Miller to convey plaintiff to the hospital. He was not at the Casino at the time of the initial incident and he never spoke with plaintiff about what occurred at the Casino.[2] Someone told Officer Miller police officers used force because there was an assault and plaintiff resisted arrest.

While in the ambulance, the EMT tended to plaintiff, who was wearing handcuffs. One EMT was in the back of the ambulance with Officer Miller and plaintiff, while another EMS person drove the ambulance. While in the ambulance, plaintiff became agitated and combative.[3] The EMT tried to put plaintiff in a certain position that was causing plaintiff severe pain. Plaintiff's major complaint was leg pain. The EMT reported plaintiff rated his pain as 10/10. While in the ambulance, the EMT did not know plaintiff's femur was dislocated outside of his hip socket. The EMT tried to put an IV in plaintiff and roll him over, but plaintiff began swinging his arm and flailing around. Plaintiff attempted to get into a different position on his left side but the EMT believed it would cause him further injury and that it was not feasible due to plaintiff's aggressive behavior. Plaintiff was removing medical equipment and the EMT could not take his vitals because of his "irate behavior." According to Officer Miller, this required him to assist in restraining plaintiff, although Officer Miller does not recall being asked by the EMT to do so.

---

[2] Plaintiff denies this fact citing his own testimony that Miller interrupted plaintiff when plaintiff was telling the doctor how he was injured. According to plaintiff, Miller told the doctor he fell down the stairs. However, whether or not this is true, it does not rebut the fact that Miller never spoke to plaintiff about what occurred.

[3] Plaintiff denies he was combative but the evidence he cites does not dispute he was combative, it only clarifies that he was in severe pain at the time.

When plaintiff was initially put in the ambulance, one of his arms was left unhandcuffed so the EMT could properly treat him by administering an IV. After plaintiff's movement prevented the EMT from treating him, Officer Miller handcuffed his free arm. The EMT reported "restraints were done in due regard to patient and for safety of EMS individual." Plaintiff continued to swear at the EMT and Officer Miller, but did not say, "I'm going to kill you guys," "screw you, cops" or any such language.  At some point the ambulance pulled over and stopped. Officer Miller did not tell the ambulance driver to stop.

The parties dispute what occurred when Officer Miller secured plaintiff's free arm. According to Officer Miller, he grabbed plaintiff's arm, placed it back on the gurney and applied a second set of handcuffs to plaintiff's arm and a metal bar at the edge of the gurney. According to plaintiff, Officer Miller handcuffed his free arm, and pushed his hip onto the gurney. As plaintiff pleaded and begged him to stop because he was in severe pain, Officer Miller punched plaintiff in the abdomen several times.

Prior to the incident in the ambulance, Officer Miller had no physical contact with plaintiff. Officer Miller believed he did not need to include the ambulance incident in the police report because he did not think it rose to the level of needing documentation. Officer Miller, nor anyone else, reported a use of force in the ambulance to Sergeant Napier. Officer Nicolay did not believe it was necessary for Officer Miller to tell him about restraining him in the ambulance as long as it did not reach the point of resisting arrest or an assault. After the incident, the EMT reassessed plaintiff's hip to make sure there was no additional injury.

Officer Miller testified plaintiff did not cooperate with staff when he arrived at the hospital; he was upset, not answering their questions, and flailing around. Officer Nicolay does not recall plaintiff being combative at the hospital. Officer Miller described plaintiff's combative behavior

as raising his voice, screaming out, and flailing his arms and body as best he could. This information was not included in the police report. At all times, plaintiff was in handcuffs, even while in the hospital room. Officers Miller and Nicolay sat outside the curtain surrounding plaintiff. At some point, Officer Miller removed one of plaintiff's handcuffs. Plaintiff was quickly medicated by medical staff.

After Officer Miller left the hospital that morning, he had no further interactions with plaintiff. He has no personal knowledge of plaintiff's release from custody. Officer Miller believes Sergeant Vogt replaced him and Officer Nicolay at the hospital. He does not know who relieved Sergeant Vogt at the hospital. Officer Nicolay testified it is not common for a sergeant to sit on a hospital detail unless there are extenuating circumstances such as manpower issues. Officer Nicolay testified having an officer from another district replace them was unusual, but happened on a regular basis due to manpower issues or extenuating circumstances. He does not know if on January 20 his district was having staffing issues.

iv.    At the Hospital

Plaintiff testified he had an interaction with a police officer when he wanted to make an emergency contact before going into surgery and the officer instructed medical personnel not to allow him to do so. At that point, the officer was the only officer with plaintiff. Plaintiff testified he wrote down what happened to him and had a physician and nurse sign it. He asked the nurse to put the note in a bag, and then she slipped the bag underneath his left side before he was taken off to surgery. When he later returned to his hotel, the note was missing from the bag. Plaintiff does not know who took the piece of paper. He believes Officer Miller saw him write the note. Officer Miller testified he did not see plaintiff write anything down and he did not take anything from plaintiff, such as a piece of paper.

7

When plaintiff explained to a doctor what happened to him, Officer Miller interrupted him to say plaintiff fell down the stairs. After his surgery, plaintiff woke up to a Hispanic officer in his room who told him there was a video of the incident at the Casino. The officer stated it was really messed up and asked plaintiff he was going to "go after them or not." Plaintiff responded no. He was afraid of what else could happen to him if he pursued it. Plaintiff testified the officer was looking through his medical chart and that he believes there was another officer in the background at this time. Plaintiff testified that a couple of hours later, another officer told plaintiff the video was under review.[4] Sergeant Napier is unaware of any off-duty officers going to the hospital to see plaintiff. Plaintiff also testified that at some point while at the hospital, two white officers arrived to have plaintiff released but the doctors did not release him and the officers complied with the doctor's orders. Sergeant Napier has no information about plaintiff's assertions that officers tried to remove him from the hospital and a doctor refusing to release him. While at the hospital, plaintiff's dislocated hip was popped back into place.

### v.  Transport and Booking

Plaintiff testified the officers who came to transport him to jail told him the police department would take care of his medical bills because his injuries occurred while he was in their custody. He does not remember what the officers looked like, other than that they were white. Plaintiff testified none of the officers who were involved in the incident at the Casino were at the hospital, other than the officer in the ambulance. At some point, a doctor released him and he was

---

[4] Defendants assert these facts constitute hearsay and are inadmissible. However, they are not asserted to prove the truth of the matter, that the police officer actually believed what happened to plaintiff was messed up or that there is actually a video, but are asserted to prove a conspiracy between police officers to cover-up the incident.

loaded into the back of a van. Doctors told him to return to the emergency room if he felt symptomatic. Two officers took plaintiff to the Justice Center, the City's jail, for booking.

Plaintiff testified that, while in the van, the officers did not have any conversations with him beyond, "Come over here. Let's go." Plaintiff testified the officers put plaintiff in a wheelchair, and took him upstairs in an elevator to the booking area. His fingerprints and photographs of him were taken. Two officers then took him back downstairs and put him in a squad car, different from the van in which he arrived. Plaintiff assumed these were the same officers who brought him in the van, but he does not know. According to plaintiff, those officers then drove him around a couple of city blocks, stopped in front of an office building, threw his crutches on the ground, and kicked him out of the car. Plaintiff was afraid, he did not have a phone to contact anyone. He did not know if he was going to come out of this incident alive. Plaintiff testified the officers were Caucasian. He also testified the officers told him to go back to Chicago and if he does not make a big deal out of this, they will not either. Plaintiff was never charged with a crime. Sergeant Napier has no knowledge of plaintiff being booked into Justice.

### vi.   Brent Fincher

On January 20, Officer Fincher was a patrol officer in the Fourth District working from 7:00 a.m. to 3:00 p.m. Based on his review of audio recordings, Officer Fincher believes he was instructed to go to the hospital when he got to work at 7:00 a.m. for hospital detail with plaintiff. He does not remember who the officers were at the hospital when he arrived. At some point, he was relieved and went back on regular patrol. While on patrol, he was called to transport prisoners in a police van driven by another officer. They responded to a call over the radio for a transport from SLU hospital, at which point they drove to the hospital. They then conveyed plaintiff to the Justice Center. Officer Fincher does not have any recollection of taking plaintiff in his vehicle after

9

booking. Officer Fincher believes a "fit for confinement" form must be received by police and physically taken to booking. Officer Fincher never told plaintiff "Don't cause trouble with us, we won't cause trouble for you." Officer Fincher never heard anything about the incident that occurred at the Casino with the off-duty officers.

### vii.    Ryan Strittmatter

On January 20, Officer Strittmatter was a police officer with the Ninth District. He transported plaintiff from SLU hospital to the Justice Center. Officer Strittmatter was making a prisoner run to take prisoners to the Justice Center. Another officer told him that when they were done with the prisoners they had, they needed to go to SLU hospital to pick up a prisoner. Officer Strittmatter does not remember which officer was with him at the time or what officer told him to go to the hospital. It is customary to have two people on a detail to transport a person to booking from the hospital. Officer Strittmatter cannot remember if he was given a Fit for Confinement letter for plaintiff but he would not have left the hospital without it. Officer Strittmatter was not listed in the police report for this incident. Normally any officers dispatched to an incident would be reflected in the dispatch. He believes it is important to reflect in the police report any officers that had custody over an individual. Officer Strittmatter has never worked for Hudson Security.

### viii.    Scott Aubuchon

On January 20, Lieutenant Aubuchon was a lieutenant in the Ninth District. Lieutenant Aubuchon's sole involvement was to approve the Fourth District police report of the Casino incident. Fourth District Sergeant Lucy Miller asked Lieutenant Aubuchon to review the report. The Fourth and Ninth Districts share the same station. Lieutenant Aubuchon does not remember who the lieutenants were in the Fourth District on January 20. There were either five or six lieutenants in that district. He does not remember why there were no lieutenants available in the

Fourth District on January 20 to review the report. Lieutenant Aubuchon would be surprised if there was no staff report on this incident. Sergeant Vogt does not know why a Ninth District commander would approve a Fourth District report. It appears from the time stamps that the report was approved in roughly three to four minutes.

Supervisors review reports to make sure there are no grammatical errors in them and to ensure they meet the standards the SLMPD has for police reports including making sure all material information, meaning information needed to forward the case to the prosecuting attorney's office, is in the report and documented correctly. Supervisors also review reports for any inconsistencies and to see if more investigation on an issue is needed, along with a variety of other reasons. The purpose of a supervisor reviewing a report is not to rubber stamp the report. Not being at the scene, Lieutenant Aubuchon relied on and trusted the officers to accurately relate the information to him in the report. Lieutenant Aubuchon does not remember telling any officers to go to the hospital. In the last twenty years, Lieutenant Aubuchon has not worked for Hudson Security.

### ix.    Terrence Howard

On June 20, Officer Howard was an officer working for the Eighth District. Officer Howard worked for Hudson Security at that time. He was working at the Casino from 12:00 to 4:00 a.m. His work did not include working on the gaming floor. At some point, Officer Howard was contacted by a supervisor who told him to go to SLU hospital for hospital detail. He does not remember who told him to report to the hospital. He went to the hospital where he relieved the officers on duty. He was wearing his police uniform. Officer Howard waited at the hospital for

plaintiff's Fit for Confinement documentation to be completed.[5] He then asked officers to respond to the hospital to transport plaintiff to the Justice Center. He delivered the Fit for Confinement form to another officer, but he cannot remember which officer.[6] Officer Howard did not interact with plaintiff in any manner.

### x.    John Vogt

On January 20, Sergeant Vogt was a sergeant in the Fourth District, working in the morning. He went to the hospital to relieve the night watch so the day watch officers could take over their car. This was not something he typically did in a supervisory capacity. He does not remember having any conversations with plaintiff. He sat outside the curtain surrounding plaintiff. Sergeant Vogt estimates he was at the hospital for an hour before being relieved. He did not know he was going to be relieved, the new officers just showed up. Sergeant Vogt has no recollection of plaintiff.

Sergeant Vogt never read the police report involving this incident. He would expect Fourth District officers to relieve other Fourth District officers maintaining custody of a pretrial detainee at the hospital. The police report does not reference who relieved Sergeant Vogt, or who conveyed plaintiff to booking. Lieutenant Aubuchon found this to be unusual, but not remarkably unusual. Sergeant Vogt cannot remember who relieved him. The police report also does not indicate that Sergeant Vogt was the officer or supervisor involved in the hospital detail for plaintiff. Sergeant Vogt would expect these details to be in the police report. Sergeant Vogt does not know why there is not an audio dispatch of him leaving the hospital and returning to service. Sergeant Vogt believes

---

[5] Plaintiff disputes that Fit for Confinement documentation was ever completed because it has not been produced in this case.

[6] Plaintiff disputes this based on the fact that a Fit for Confinement form has never been produced in this case.

anyone who speaks with a pretrial detainee should be documented and that anyone who is not involved in an investigation of a detainee should be prohibited from going into the hospital room. Sergeant Vogt also believes there should be a radio dispatch saying that plaintiff was leaving the hospital to be booked. Sergeant Vogt would expect a fit for confinement document to be with the booking papers.

### xi.   Lois Weatherspoon

Lois Weatherspoon is a prisoner supervisor who retrieved plaintiff's file including the arrest report, incident report, and booking sheets. The booking sheet says "Major" but Ms. Weatherspoon does not know who brought plaintiff in for booking. The incident report does not indicate who took plaintiff from the hospital to booking. Ms. Weatherspoon does not remember seeing a Fit For Confinement form for plaintiff. It would not be in the records she has. It would be unusual for any property plaintiff had at the time of booking, if he did in fact have any property, to not be listed on the booking forms. Ms. Weatherspoon believes that any officer who removes property from an individual should list the property on the sheet. Every individual who comes to the jail has an extensive medical screening done.

### xii.   Secondary Employment

Lieutenant Aubuchon agrees every officer is expected to understand and know SLMPD's policies and special orders and that as a commander and supervisor, he has a role in ensuring compliance with the appropriate policies and orders. Lieutenant Aubuchon did not inquire into why four off-duty officers were working at a casino. SLMPD policy states, "No member may work in any capacity at a gambling casino." Lieutenant Aubuchon has never approved a secondary employment officer to work in a casino.

Officer Nicolay has worked secondary employment for five years. To work secondary employment, officers must fill out an application and have it approved by a superior officer. For Officer Nicolay, Sergeant Napier would have to approve his secondary employment. Officers must agree to comport with the SLMPD Office of the Chief of Police Special Orders for secondary employment. Officer Nicolay knows there are certain activities that police officers cannot do for secondary employment. For the officers who worked at the Casino on January 20 and were involved in the use of force against plaintiff, Sergeant Napier did not see in their secondary employment applications anything to indicate they were working at the Casino. Sergeant Vogt was not aware officers were working secondary employment at Lumiere Casino prior to January 20.

### xiii.    Relationships between Officers

Neither Lieutenant Aubuchon, Sergeant Vogt, or Officers Strittmatter, Fincher, or Howard are Hispanic nor have they ever been confused to be Hispanic to their knowledge. Lieutenant Aubuchon, Sergeant Vogt, and Officers Strittmatter, Fincher, and Howard have never been friends with or had close working relationships with each other or with Officers Nicolay, Miller, Major, Shelton, Vonnida, or Cody. Officer Miller knew and worked with Lieutenant Aubuchon in the same district. Officer Miller also knew Sergeant Vogt in that Sergeant Vogt was his supervisor who sometimes approved his reports. Officer Nicolay worked under Sergeant Napier for four to five years, attended Sergeant Napier's wedding, has hung out with him socially, and considers Sergeant Napier a friend. Officers Miller and Nicolay are social and work friends. According to Officer Nicolay, Sergeant Napier and Officer Miller are also friends. Because Sergeant Napier was his supervisor and could affect his career, Officer Miller wanted to keep Sergeant Napier happy. When Sergeant Vogt and Sergeant Napier worked in the Fourth District together, Sergeant Vogt would relieve Sergeant Napier from his night watch when he came on day watch, or vice versa.

14

This required some discussion between the two about day-to-day operations. The two have spoken on occasion.

## II.     STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   DISCUSSION

Defendants move for summary judgment on all remaining counts and assert several arguments in support of their motions. First, they argue plaintiff fails to state a claim for deliberate indifference to serious medical needs, and even if he did, defendants were not deliberately indifferent to his serious medical needs. Second, they assert Officer Miller responded reasonably to assist the EMT in restraining plaintiff and the force he used was not excessive. Third, they contend plaintiff fails to state a claim for failure to intercede, and that they were not required to intercede. Fourth, defendants argue plaintiff fails to state a claim for false imprisonment, or, in the alternative, he was not falsely imprisoned. Fifth, they assert plaintiff fails to state a claim for injurious falsehood and even if he did, defendants did not do so. Sixth, they argue plaintiff fails to state a claim for violating plaintiff's First Amendment right to right of access to the courts or to petition the government. Seventh, they contend plaintiff fails to state a claim for fraud and conspiracy to commit a civil tort and even if he did, they did not commit any civil torts. Finally, they claim qualified immunity, official immunity, and the public duty doctrine, and that the statute of limitations bars plaintiff's state law claims.

The Court begins by addressing defendants' assertion of qualified immunity as to each of plaintiff's § 1983 claims and then addresses the remaining arguments as needed.

### A.   Qualified Immunity

Qualified immunity protects governmental officials from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Officials are entitled to qualified immunity unless a plaintiff can show "(1) a deprivation of a constitutional right, and (2)

that the right was clearly established at the time of the inquiry." *Robbins v. City of Des Moines*, 984 F.3d 673, 678 (8th Cir. 2021). A court may address either inquiry first. *Id.*

### i.       Count I – Deliberate Indifference to Plaintiff's Serious Medical Needs

In Count I of his Second Amended Complaint, Plaintiff alleges defendants were deliberately indifferent to his serious medical needs when Sergeant Napier delayed the departure of the ambulance to take him to the hospital, Officer Miller struck him while in the ambulance, the ambulance stopped while in route to the hospital, officers removed him from the hospital without obtaining a Fit For Confinement form, and officers failed to properly book him into the Justice Center and dropped him off at a random location. Because plaintiff fails to establish he was deprived of a constitutional right, defendants are entitled to qualified immunity on this claim. *Robbins*, 984 F.3d at 678.

The Due Process Clause of the Fourteenth Amendment requires the government to provide medical care to individuals who have been injured while being apprehended by police.  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).[7]  To establish a claim for deliberate indifference to serious medical needs, a plaintiff must establish both objective and subjective components.  *Thompson v. King*, 730 F.3d 742, 746 (8th Cir. 2013).  The objective component requires plaintiff to show an objectively serious medical need.  *Id*.  The subjective component requires plaintiff to show the "defendant knew of, but deliberately disregarded, such need."  *Id*.

Plaintiff has not established that any defendant was deliberately indifferent to his serious medical needs.  First, plaintiff has not shown that any delay from the departure of the ambulance or the stop while en route to the hospital caused him any additional injury, and he must do so to

---

[7] The Fourteenth Amendment applies to claims of deliberate indifference to serious medical needs of pretrial detainees while the Eighth Amendment applies to those same claims for convicted prisoners. *City of Revere*, 463 U.S. at 243-44.

establish his claim. *See Jackson v. Riebold*, (8th Cir. 2016). When a plaintiff claims a delay in medical treatment rises to a constitutional violation, the seriousness of the deprivation is "measured by reference to the delay in treatment." *Id*. "The inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Id*. Here, there is no evidence the delay leaving the casino or when the ambulance stopped had anything more than a *de minimis* effect on plaintiff.

Second, plaintiff fails to establish defendants were deliberately indifferent because during all of the times of the alleged delays, EMS was attending to plaintiff's injuries. Nothing in the record suggests officers were impeding the care plaintiff received from EMS. No one from EMS told officers they needed to get to the hospital immediately, or in any other way indicated the delay in the ambulance's departure was detrimental to plaintiff. "Deliberate indifference is the reckless disregard of a known, excessive risk of serious harm to [a detainee's] health or safety." *Jackson v. Everett*, 140 F.3d 149, 1152 (8th Cir. 1998). Finally, there is no evidence that officers caused the ambulance to stop en route to the hospital. Officer Miller testified he did not tell the ambulance driver to stop and there is no evidence to refute this.

The remaining defendants had no interactions with plaintiff prior to his arrival at the hospital and there is no evidence they interfered with his medical care while at the hospital or afterwards. While it is disputed whether or not a Fit For Confinement form was provided to the officers prior to their transport of him to the Justice Center, it is undisputed that doctors discharged him from the hospital. Plaintiff provides no case law holding that an officer is deliberately indifferent for failing to obtain a certain form for discharge.

There is also no evidence suggesting while en route to the Justice Center, officers were indifferent to any of plaintiff's medical needs. Finally, there is no evidence in the record that any

18

of the named defendants participated in dropping plaintiff off at a random location. To establish officers knew of plaintiff's medical needs but deliberately disregarded them, plaintiff must show more than even gross negligence, and he has not done so. *Thompson*, 730 F.3d at 747. Plaintiff has not established he was deprived of a constitutional right. Therefore, defendants are entitled to qualified immunity and the Court grants summary judgment to defendants and dismisses this claim.

### ii.    Count II – Excessive Force

In Count II of his Second Amended Complaint, plaintiff asserts a claim for excessive use of force under the Fourteenth Amendment alleging Officer Miller struck him in the ambulance while he was restrained. "In addressing an excessive force claim under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "All claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id*. at 395. Here, the alleged excessive use of force in the ambulance occurred during the arrest and seizure of plaintiff. Therefore, the Court analyzes plaintiff's claim under the Fourth Amendment rather than the Fourteenth Amendment.

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the circumstances." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). The Court considers the claim from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. "Circumstances relevant to the reasonableness of the officer's

conduct include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

In this case, the undisputed evidence presented to the Court establishes Officer Miller was not at the casino for the original incident. When he got into the ambulance with plaintiff, his only knowledge was that officers had used force against plaintiff because there was an assault and plaintiff resisted arrest. Then while in the ambulance, plaintiff was agitated and combative. The EMT tried to put an IV in him but was unable to do so. When the EMT tried to roll plaintiff over, plaintiff began swinging his arm around. Plaintiff was removing medical equipment and the EMT could not take his vitals because of his behavior. There is a genuine issue of material fact as to what occurred when Officer Miller attempted to further restrain plaintiff. Officer Miller asserts the only time he touched plaintiff was to take his arm to handcuff him to the gurney. Plaintiff claims Officer Miller pressed his hip down, and punched him in the abdomen several times while handcuffing him to the gurney.

To determine if Officer Miller is entitled to qualified immunity on plaintiff's use of excessive force claim, the Court must decide if plaintiff has shown a deprivation of a constitutional right and if that right was clearly established at the time. *Robbins*, 984 F.3d at 678. The Court does not need to resolve whether or not Officer Miller's alleged use of force was excessive because plaintiff cannot show his right to be free from excessive force under these specific circumstances was clearly established at the time of the incident. Thus, Officer Miller is entitled to qualified immunity whether or not his alleged use of force was excessive.

Plaintiff has the burden to show that his right was clearly established at the time of the violation. *Kuessner v. Wooten*, 987 F.3d 752, 755 (8th Cir. 2021). "To be clearly established, the

'contours of the right must be sufficiently clear that a reasonable official would [have understood] that what he is doing violates that right.'" *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The law must give officials "fair warning their conduct was unlawful." *Id*. (internal quotations omitted). This means "[t]here must be precedent, controlling authority, or a robust consensus of cases of persuasive authority." *Id*. (internal quotations omitted). Existing precedent must place the question "beyond debate." *Cole Estate of Richards v. Hutchins*, 959 F.3d 1127, 1134 (8th Cir. 2020). The Court "look[s] to existing precedent that involves sufficiently 'similar facts' and that 'squarely governs' the specific facts at issue." *Id*. (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)). There may also be the "rare obvious case where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Quraishi v. St. Charles Cty., Mo.*, 986 F.3d 831, 835 (8th Cir. 2021).

"There is, of course, no question that the use of objectively unreasonable force violates the Fourth Amendment." *Boudoin v. Harsson*, 962 F.3d 1034, 1039 (8th Cir. 2020) (citing *Tatum v. Robinson*, 858 F.3d 544, 547 (8th Cir. 2017)). But, "'clearly established law' may not be defined at a 'high level of generality.'" *Id*. (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). In the Fourth Amendment context, specificity is particularly important. *Sok Kong Trustee for Map Kong v. City of Burnsville*, 960 F.3d 985, 992 (8th Cir. 2020). The Supreme Court has recognized "'that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id*. (quoting *Kisela*, 138 S. Ct. at 1152). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Id*. (quoting *Kisela*, 138 S. Ct. at 1153).

Here, plaintiff has provided no precedent that places the question of plaintiff's right beyond debate. *See Boudoin*, 962 F.3d at 1039 ("[A] plaintiff must generally identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment" (internal quotations omitted)). Nor can the Court find any precedent that clearly establishes that an officer violates the Fourth Amendment ban on excessive force when the individual, such as plaintiff here, was actively resisting and refusing to cooperate with an EMT attempting to provide needed medical intervention. Officer Miller was faced with an individual who he was informed just assaulted another person and resisted arrest and was now refusing to lay in a safe position while being transported to the hospital in an ambulance and acting in a way that harmed himself. Without any precedent, the Court cannot find plaintiff's right is clearly established as this is not the "rare obvious case where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Quraishi*, 986 F.3d at 835. Consequently, the Court finds Officer Miller is entitled to qualified immunity on plaintiff's use of excessive force claim and it grants summary judgment in Officer Miller's favor on this claim.

### iii. Count III – Failure to Intercede

In Count III of his Second Amended Complaint, plaintiff alleges each defendant failed to intercede and protect plaintiff from an unlawful scheme that targeted him to deprive him of his constitutional rights, they formed an agreement to participate in the unlawful scheme, they each took action in furtherance of the scheme, and they each acted with deliberate indifference to plaintiff's constitutional rights in violation of the Fourth and Fourteenth Amendments. (Doc. 144, ¶¶ 135-156.) Plaintiff further alleges Officer Nicolay had a duty to, but did not, protect plaintiff from Officer Miller when the ambulance stopped and that all of the defendants had numerous opportunities to intercede on plaintiff's behalf. Plaintiff alleges Sergeant Vogt and Officer Howard

22

guarded plaintiff and kept him confined while at the hospital and Officers Fincher and Strittmatter took plaintiff from the hospital without a Fit For Confinement form and transported him to the Justice Center. Plaintiff asserts this claim against defendants in their individual and official capacities.

### 1.    Official Capacity Claim

A claim made against a public official in his official capacity is another way of pleading an action directly against the public entity of which the officer is an agent. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). As a result, suits against public officials in their official capacity must be treated as suits against the public entity. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The Court treats the Second Amended Complaint as asserting claims against the City of St. Louis (the "City"), as the Police Department lacks a legal identity apart from the city in which it operates and police departments are not suable entities under § 1983. *See Franklin v. City of St. Louis*, No. 4:15-CV-01283-NCC, 2016 WL 2986373, at *4 (E.D. Mo. May 24, 2016), *Graham v. St. Louis Metro. Police Dep't*, No. 4:15-CV-1324-AGF, 2016 WL 1090625, at *3 (E.D. Mo. Mar. 21, 2016) (citing *Ketchum v. City of West Memphis, Ark.*, 974 F.2d 81, 82 (8th Cir. 1992)).

Defendants argue plaintiff's claim against them in their official capacities is barred by the Eleventh Amendment. Sovereign immunity, recognized in the Eleventh Amendment, bars actions for damages against states, arms of the state, and state officers in their official capacities. *Alden v. Maine*, 527 U.S. 706, 756 (1999); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."). "While Eleventh Amendment immunity extends to states and arms of the state, it does not extend to local governments." *Thomas v. St. Louis Bd. of Police Comm'rs*, 447 F.3d 1082, 1084 (8th Cir. 2006). Thus, as employees of the City, a local government, defendants are not entitled to Eleventh

23

Amendment immunity on plaintiff's official capacity claims. *See S.L. ex. rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Comm'rs*, No. 4:10-CV-2163 (CEJ), 2012 WL 3564030 at *6 (E.D. Mo. Aug. 17, 2012). However, even though the Eleventh Amendment does not bar plaintiff's official capacity claim, the Court still dismisses the claim because plaintiff fails to establish the City is a moving force behind his alleged deprivations.

In an official-capacity claim, to establish an entity is liable under § 1983, a plaintiff must show the entity itself is a "moving force" behind the deprivation. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Thus, liability may attach to a municipality, such as the City, if the violation results from (1) an "official municipal policy," (2) an unofficial "custom," or (3) a failure to train or supervise. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Alternatively, a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).

Plaintiff neither alleges nor establishes an official policy or custom was the moving force behind the alleged constitutional violations, nor does he allege or establish a failure to train or

supervise. Consequently, the Court grants summary judgment to defendants on plaintiff's official capacity claim for failure to intercede and dismisses the claim.

### 2.      Individual Capacity Claim

On plaintiff's claims of failure to intercede against defendants in their individual capacities, the Court grants summary judgment to defendants on the basis of qualified immunity. The Eighth Circuit has not recognized a duty to intervene to prevent constitutional violations outside of the excessive force context. *Livers v. Schenck*, 700 F.3d 340, 361 (8th Cir. 2012). Where "the federal circuits disagree on whether conduct violates the Constitution, and [the Eighth Circuit] has not addressed the question, that conduct does not violate clearly established law." *Id*. Therefore, defendants are entitled to qualified immunity for plaintiff's failure to intercede claims because he has not established a deprivation of a constitutional right or that this right was clearly established.

Plaintiff does assert defendants failed to intercede in Officer Miller's alleged use of excessive force against plaintiff while in the ambulance. However, defendants are still entitled to qualified immunity because plaintiff has not established he was deprived of a constitutional right. The majority of the defendants, Officers Fincher, Strittmatter, and Howard, Sergeant Vogt, and Lieutenant Aubuchon, had no interaction with plaintiff until after he arrived at the hospital. Sergeant Napier had no interaction with plaintiff after he was loaded into the ambulance. Sergeant Napier did not ride in the ambulance, follow the ambulance, or go to the hospital.[8] Officer Nicolay followed behind the ambulance, did not know anything of what occurred in the ambulance, and when the ambulance stopped, he was told everything was fine and they promptly continued to proceed to the hospital. The undisputed facts show there was no opportunity for any of these

---

[8] Sergeant Napier also cannot be held liable on a theory of respondeat superior. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1030 (8th Cir. 2012) ("Supervisors . . . cannot be held vicariously liable under § 1983 for the actions of a subordinate.").

defendants to intercede in the alleged use of force by Officer Miller in the ambulance. Therefore, defendants are entitled to qualified immunity on this claim and the Court grants summary judgment to defendants.

### iv.      Count VI – Access to the Courts/Petition the Government

In Count VI of his Second Amended Complaint, plaintiff alleges defendants agreed to an elaborate scheme to deter plaintiff from reporting or filing a complaint about the incident at the casino. (Doc. 144, ¶¶ 184-204.) Plaintiff argues defendants concealed evidence, including a video and witnesses, made false allegations, let false allegations stand in an incident report, and "fake" booked him and then released him at an unknown location all to prevent plaintiff from filing a complaint.

The right of access to the courts is "well-established." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1020 (8th Cir. 2008). The right applies to the actual denial of access to the courts and also when a plaintiff is denied meaningful access due to some impediment created by the defendant. *Id*. The constitutional basis for the right is unsettled. *Scheeler v. City of St. Cloud, Minn.*, 402 F.3d 826, 830 (8th Cir. 2005). Support for the right to access to the courts can be found in the First Amendment and the Due Process Clause. *Id*. at 831. The "overwhelming majority" of cases involving the right to access the courts under the Due Process Clause involve prison litigation, such as a prisoner's access to counsel, mail, or the law library. *Id*. In this case, the more appropriate analysis is under the First Amendment, rather than the Due Process Clause. For cases brought under the First Amendment, the plaintiff must show the defendant acted with some intentional motivation to restrict his access to the courts. *Id*. at 830.

In right to access, or denial of access, claims, whether under the Fourth or Fourteenth Amendment, there are two categories of claims. *Christopher v. Harbury*, 536 U.S. 403, 412-13

(2002). There are "forward" claims where an official action frustrates a plaintiff's ability to prepare or file a suit presently. *Id*. at 413. These cases are commonly prison-litigation cases or cases challenging filing fees for indigent plaintiffs. *Id*. The goal of the case is to remove the condition preventing the filing of suit of a separate claim for relief. *Id*. The second category of cases are "backward" claims where the plaintiff alleges to have been denied access and now has lost the opportunity to bring the other, underlying case. *Id*. at 414. These are cases where "specific litigation ended poorly, could not have commenced, or could have produced a remedy subsequently unobtainable." *Id*. The goal of these claims is for judgment in the access claims themselves, not for judgment in a future lawsuit. *Id*.

Thus, in right to access cases, the underlying cause of action that has been lost, or may be lost, is an element that must be described in the complaint. *Id*. at 415. In cases that look backward, the complaint must also identify a remedy that could have been awarded but is not otherwise available in a suit that may yet be brought. *Id*. "There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case with the denial-of-access element." *Id*.

Here, plaintiff's allegations attempt to state a claim for a backward-looking case, rather than seeking to remove some barrier to be able to file a future suit. The problem with plaintiff's right to access claim is that in this same case, he brought claims for excessive use of force, deliberate indifference to medical care, failure to intercede, along with several state law claims. These are the same claims he is asserting as the basis of his right to access claim. As the Supreme Court stated, "these backward-looking cases are brought to get relief unobtainable in other suits." *Id*. at 416. Plaintiff was able to assert his other claims in this suit. Therefore, he fails to state a claim he was denied access to the courts. *See also Harmon v. St. Louis Cty.*, No. 4:08CV226 SNLJ,

27

2009 WL 880024 at *4 (E.D. Mo. Mar. 30, 2009) ("Even viewing plaintiff's allegations in the broadest possible light, he still fails to state a [denial of right to access the courts] for the very reason that the existence of this alleged falsified police report has not thwarted his pursuit of a lawsuit in this Court.").

There is an Eighth Circuit case that suggests a plaintiff could assert a claim for denial of his right to access the courts based on threats. In *Harrison v. Springdale Water & Sewer Commission*, the Eighth Circuit stated, "An individual's constitutional right of access to the courts cannot be impaired either directly . . . or indirectly, by threatening or harassing an individual in retaliation for filing lawsuits. It is not necessary that the individual succumb entirely or even partially to the threat as long as the threat or retaliatory act was intended to limit the individual's right of access." 780 F.2d 1422, 1427-28 (8th Cir. 1986). But here, even if plaintiff is allowed to assert a claim for a denial of right to access the courts for a scheme to deter him from filing a lawsuit when he was able to actually file that lawsuit, there is no evidence the named defendants participated in the scheme to deprive him of his right to access the courts.

There is no evidence that defendants participated in the use of excessive force against plaintiff at the casino, wrote the report allegedly covering up the use of excessive force, threatened plaintiff in any way, fake booked him into the Justice Center, or dropped him off at an undisclosed location. Defendants do admit some of these events did occur, but there is no evidence that Sergeants Napier and Vogt, Lieutenant Aubuchon, or Officers Miller, Nicolay, Fincher, Howard, or Strittmatter were the officers who did so. While there is a genuine dispute of fact as to whether Officer Miller used force against plaintiff in the ambulance, there is no evidence he did so to prevent plaintiff from filing a lawsuit. The undisputed facts before the Court establish that if Officer Miller did use force against plaintiff, it was because plaintiff refused to comply with the

EMT's commands, not in an attempt to intimidate or threaten plaintiff. Finally, although Lieutenant Aubuchon reviewed and approved the allegedly inaccurate police report, there is no evidence he had knowledge the report was inaccurate and approved it to intentionally deter plaintiff from filing a lawsuit.

When construing the facts in a light most favorable to plaintiff, the evidence suggests some police officers engaged in some cover-up of what occurred at the casino. However, there is no evidence that connects any of these defendants to a cover-up. Consequently, defendants are entitled to qualified immunity on plaintiff's right to access the court claim because plaintiff has not established a deprivation of a constitutional right. The Court grants summary judgment to defendants on this claim.

### B.     State Claims

In addition to his federal claims, plaintiff asserts three state law claims: (1) false imprisonment; (2) false imprisonment and injurious falsehood; and (3) fraud and civil conspiracy, which includes a state and federal claim.

### i.     Count IV – False Imprisonment

In Count IV of his Second Amended Complaint, plaintiff alleges defendants falsely imprisoned him at the casino, in the ambulance to the hospital, while guarding him at the hospital, and then, later, when transporting him to the Justice Center. (Doc. 144, ¶¶ 157-167.) The Court previously dismissed several defendants from this claim and the remaining defendants are Sergeant Napier, and Officers Nicolay, Miller, and Howard.

"False imprisonment, also called false arrest, is the confinement, without legal justification, by the wrongdoer of the person wronged." *Highfill v. Hale*, 186 S.W.3d 277, 280 (Mo. 2006). The elements of a claim for false imprisonment are "(1) the detention or restraint of the plaintiff against

his will and (2) the unlawfulness of the detention or restraint." *Rankin v. Venator Grp. Retail, Inc.*, 93 S.W.3d 814, 822 (Mo. Ct. App. 2002). The undisputed facts show that Sergeant Napier, and Officers Nicolay, Miller and Howard were not present for plaintiff's initial arrest at the casino. There are no facts even suggesting that Officer Nicolay, Miller, or Howard had any knowledge that plaintiff had not assaulted another person or resisted arrest. The undisputed facts establish Officer Miller did not even review the police report for the incident until this litigation and that he never spoke with plaintiff about what occurred at the Casino. Officer Howard never interacted with plaintiff, and there are no facts in the current record to suggest he knew what occurred even though he was working at the casino on that morning.

In *Rustici v. Weidemeyer*, police officers went to the plaintiff's house to investigate alleged acts of vandalism. 673 S.W.2d 762, 766 (Mo. 1984). A routine check revealed plaintiff had a Kansas City warrant for an unpaid parking violation. *Id*. The officers contacted the Kansas City police and Officer Weidemeyer was dispatched to the scene. *Id*. When he arrived, the plaintiff explained that a mistake had been made, he did not drive the car on the parking ticket, and his son had his same name. *Id*. Officer Weidemeyer arrested plaintiff and took him to a Kansas City police station. *Id*. The charges were eventually dropped and plaintiff filed an action alleging a claim for false arrest, among others. *Id*.

The Missouri Supreme Court held that it did not matter if Officer Weidemeyer was the initial arresting officer, or if he merely detained plaintiff following his arrest by other officers. *Id*. at 767. "[A]ll persons who directly procure, aid, abet, or assist in an unlawful imprisonment are liable as principals." *Id*. (quoting *Parrish v. Herron*, 225 S.W.2d 391, 399 (Mo. Ct. App. 1949). The court concluded, "Even if Weidemeyer served as no more than a jailer, a jailer is liable for

false imprisonment if he knows or should know that an arrest was illegal and that he has no right to imprison the person arrested." *Id*.

Here, the undisputed facts show Officers Nicolay, Miller, and Howard served essentially as jailers, like Officer Weidemeyer in *Rustici*. However, unlike Officer Weidemeyer, there is no evidence that Officers Nicolay, Miller or Howard knew or should have known plaintiff's arrest was illegal, if in fact it was illegal as plaintiff argues. Therefore, they are not liable for false imprisonment because they did not know, nor should they have known, plaintiff's arrest was allegedly unlawful.

The analysis for Sergeant Napier is slightly more complicated. Sergeant Napier arrived on the scene and spoke with Officer Major, one of the off-duty officers involved in the use of force incident. He reviewed a security video of the incident but did not speak with plaintiff. The security video shows plaintiff engaged in a tussle with another person. It appears the other person struck plaintiff first and then plaintiff struck him. Officers immediately pull plaintiff away and while doing so he struggles against them. The officers then use force against plaintiff.[9] This video does not give Sergeant Napier reason to know plaintiff's arrest was illegal so as to make him liable for false imprisonment. In Missouri, a person can be charged and convicted of resisting arrest even if the officer was unlawful in making the arrest. Mo. Rev. Stat. § 575.150.4 (2009). It is not unreasonable for Sergeant Napier to believe plaintiff committed assault[10] and resisted arrest as was reported to him. Like with the other defendants, Sergeant Napier is not liable for false imprisonment because he did not know, nor should he have known, plaintiff's arrest was allegedly

---

[9] The Court makes no judgment as to whether or not the amount of force used was excessive as it is not necessary for this analysis.

[10] In Missouri, a person commits assault in the third degree if he or she knowingly causes physical injury to another person. Mo. Rev. Stat. § 565.054.1.

unlawful. For these reasons, the Court will grant summary judgment to defendants on plaintiff's claim of false imprisonment.

### ii.      Count V – False Imprisonment and Injurious Falsehood

In Count V of his Second Amended Complaint, plaintiff asserts a claim for injurious falsehood and false imprisonment. (Doc. 144, ¶¶ 168-183.)   The Court previously dismissed several defendants from this claim and the remaining defendants are Sergeant Napier, and Officers Nicolay, Miller, and Howard. Plaintiff alleges Sergeant Napier instructed Officer Major to prepare an incident report knowingly in conflict with a video Sergeant Napier had reviewed at the scene of the incident. He then alleges the incident report was created and approved by supervising defendants who knew the report was false. The Court addressed plaintiff's claim of false imprisonment in Count IV above. The same analysis applies to plaintiff's claim of false imprisonment in this count. Therefore, the Court will not reiterate that analysis and grants summary judgment to defendants on plaintiff's claim of false imprisonment in Count V for the same reasons as Count IV. The Court now turns to plaintiff's claim of injurious falsehood.

In Missouri, an individual is liable for injurious falsehood when he "publishes a false statement harmful to the interests of another" and he intends for publication of the statement to result in harm, and either recognizes, or should recognize, that it is likely to result in harm. *Wandersee v. BP Products N. Am., Inc.*, 263 S.W.3d 623, 628 (Mo. 2008). The defendant must know the statement is false or act in reckless disregard for its truth or falsity and the harm must result in pecuniary loss. *Id*.

There is no evidence suggesting Sergeant Napier, or Officers Nicolay, Miller, or Howard published a false statement harmful to plaintiff. None of the defendants wrote the report or approved the report. Plaintiff provides no evidence for his contention that Sergeant Napier

32

instructed Officer Major to write the report to include falsehoods. Simply put, there is no evidence these specific defendants published a false statement harmful to plaintiff. Therefore, the Court grants summary judgment to defendants on this claim.

### iii.    Count VII – Fraud and Conspiracy to Commit a Civil Tort

In his last claim, plaintiff asserts defendants committed fraud in violation of Missouri law and engaged in a conspiracy to commit the civil torts of fraud, false imprisonment, and injurious falsehood in violation of 42 U.S.C. § 1983. The Court previously dismissed this count against Sergeant Vogt, Lieutenant Aubuchon, and Officers Fincher, and Strittmatter. The remaining defendants are Sergeant Napier, and Officers Miller, Nicolay, and Howard.

### 1.    Fraud

To establish a claim for fraud under Missouri law, a plaintiff must show: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury." *Dean v. Noble*, 477 S.W.3d 197, 204 (Mo. Ct. App. 2015). In response to defendants' motions, plaintiff argues he meets the elements for fraud as follows:

> (1) the Incident Report in Plaintiff's Exhibit 34D is materially false as were all the actions concerning the "fake" booking; (2) the falsity known or his ignorance of the truth to all Defendants that participated in the conspiracy against Plaintiff; (3) it was the intent of the speaker(s) Defendants that Plaintiff would be, as contemplated by Defendants, dissuaded from making any complaint against Defendants or that others who reviewed Plaintiff's Exhibit 24D Incident Report would provide sufficient cover for Defendants or at minimal create doubt of the truth of Plaintiff's complaints. Further, that the fraud and conspiracy against Plaintiff would protect Former Defendants from any claims and conceal the identities of New Defendants; (4) the ignorance of Plaintiff Blount to know the contents of the incident report and

whether he was actually being arrested and booked as to him it would appear credible; (5) Plaintiff relied on the credible threat and "fake" booking and did not make a complaint until later date, (6) Plaintiff had a right to rely upon the credible threats made against him in the ambulance, at the Hospital, St. Louis Justice Center and in and out of the police vehicle after the St. Louis Justice Center; (7) Plaintiff's consequent and proximate injuries as a result included anguish, pain and suffering, and medical bills that should have been the responsibility of the St. Louis Metropolitan Police Department.

(Doc. 223, pgs. 32-33.) Thus, it appears the basis of plaintiff's fraud claim is the incident report and the "fake" booking into the Justice Center.

It is undisputed that Officer Major wrote the incident report. There is no evidence any defendant participated in the writing of the report or even provided information for the report. Therefore, none of the allegedly false representations made in the report can be attributed to defendants. As to the "fake" booking, there is no evidence Sergeant Napier, or Officers Miller, Nicolay, or Howard participated in or even knew it occurred. Plaintiff's assertions of threats in the ambulance, hospital, and the police vehicle after the "fake" booking cannot be tied to any of these defendants. While there is a genuine dispute of fact as to whether or not Officer Miller used force against plaintiff in the ambulance, there is no evidence before the Court that Officer Miller threatened plaintiff in any way while in the ambulance. Construing all of the facts in plaintiff's favor, the Court finds plaintiff has not shown a genuine dispute of material fact exists as to his claim for fraud. The Court grants summary judgment to defendants on this claim.

## 2.    Civil Conspiracy to Commit a Civil Tort

In his Second Amended Complaint and in his briefs in response to defendants' motions, plaintiff cites to and refers to a civil conspiracy under 42 U.S.C. § 1983. Therefore, the Court assumes he brings his claim under § 1983 rather than as a state law claim.

To prove a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must show the defendant conspired with others to deprive him of constitutional rights, that at least one co-conspirator

engaged in an overt act in furtherance of the conspiracy, and that the overt act injured the plaintiff. *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). The plaintiff is also required to prove a deprivation of a constitutional right or privilege to prevail. *Id*. Plaintiff is unable to establish he was deprived of a constitutional right or privilege as the Court has determined in its above analyses. Furthermore, he alleges a conspiracy to commit several state torts, but these are not constitutional rights or privileges.

Plaintiff's claim also fails because he has not "allege[d] with particularity and specifically demonstrate[d] material facts that the defendants reached an agreement." *Reasonover v. St. Louis Cty., Mo.*, 447 F.3d 569, 582 (8th Cir. 2006). Plaintiff has put forth no evidence that Sergeant Napier, or Officers Nicolay, Miller, or Howard conspired with others to deprive him of his constitutional rights. Plaintiff merely speculates that they were working together, along with other officers, but speculation is not enough to defeat summary judgment. *Bloom v. Metro Heart Grp. Of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006).

To the extent plaintiff asserts a claim for civil conspiracy under Missouri law, rather than § 1983, his claim fails for the same reasons – he has not shown defendants committed an underlying tort against him or that they conspired to do so. *See W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. 2012) ("To demonstrate a civil conspiracy existed, [plaintiff] must show: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) [plaintiff] was thereby damaged.").

Plaintiff relies on *S.L. ex rel. Lenderman v. St. Louis Metropolitan Police Department Board of Police Commissioners*, 725 F.3d 843 (8th Cir. 2013), to support his conspiracy claim. However, the evidence in *Lenderman* highlights the lack of evidence in this case. In *Lenderman*,

an officer, a lieutenant, arrested her son's girlfriend under false pretenses. *Id*. at 845. After spending several hours in jail, the girlfriend was released. *Id*. at 846. When the lieutenant submitted drafts of her incident report, they were all rejected. *Id*. A sergeant then suggested the lieutenant remove her name from the report, and add a named witness to the arrest. *Id*. He suggested she find a random name in the SLMPD computer system. *Id*. When the lieutenant submitted her fifth draft with the suggested changes, along with other fabrications, the sergeant approved the report.

A captain heard rumors about the unlawful arrest and reviewed the report. *Id*. at 847. Finding it problematic, he filed an employee misconduct report and started an internal affairs investigation. *Id*. Plaintiff alleges that during the investigation, the head of the internal affairs division fed confidential information to the lieutenant. *Id*. One week after the lieutenant's interview with internal affairs, her son visited the girlfriend and attempted to coerce her into changing her story to absolve his mother of responsibility. *Id*. at 847-48. The son choked the girlfriend, hit her, and threw her against a washer/dryer, and then left the house. *Id*. at 848. The investigation continued and, ultimately, the lieutenant and sergeant were both disciplined. The sergeant was given a one-day suspension and written reprimand while the lieutenant's employment was terminated. *Id*. The Eighth Circuit found this was sufficient evidence for a reasonable factfinder to find the defendants participated in a conspiracy to violate the plaintiff's constitutional rights. *Id*. at 853.

The evidence in this case is very different. Here, plaintiff rests on argument and speculation that the defendants conspired with one another, but he provides no evidence to support his allegations. He also has not provided any evidence of an agreement between the defendants. For all of the above reasons, the Court grants summary judgment on plaintiff's claim of civil conspiracy.

Accordingly, the motions of defendants Albert Napier, Zachary Nicolay, and Matthew Miller for summary judgment (Doc. 211) and of defendants Brent Fincher, Ryan Strittmatter, John Vogt, Terrence Howard, and Scott Aubuchon for summary judgment (Doc. 213) **are sustained**. There being no remaining claim, the action is dismissed with prejudice.  An appropriate Order is filed herewith.


**_____/s/   David D. Noce_____**
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 1, 2021.